UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| _____ ) | |
| JANE DOE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CIVIL ACTION NO. |
| ) | |
| E.W SCRIPPS COMPANY, ) | |
| KELI NETWORK INC. d/b/a ) | |
| JELLYSMACK, and ) | |
| COURT TV ) | |
| ) | |
| Defendants. ) | |
| _____) | |

## COMPLAINT

Society's fascination with crime has become big business.  With cameras increasingly in courtrooms, a burgeoning "true crime" genre has emerged as a source of attention and profit for the entertainment industry.  The Defendant in this case, Court TV, has benefited from the rise of this entertainment genre, providing live, gavel-to-gavel coverage across television and social media platforms of some of the nation's most compelling (or at least most sensational) trials. Court TV's access to the Commonwealth's courtrooms and its ability to record and live stream proceedings for commercial purpose are not a matter of right but a privilege.

In October 2025, Court TV sought permission from the Superior Court to record and live stream the re-trial of a high-profile rape case: Commonwealth v. Terence Crosbie.

The Superior Court granted Court TV the access it sought, subject to reasonable – and, given the law, necessary – restrictions: Doe's identity was not to be revealed through the cablecast.  Her image was not to be cablecast, and her name was not to be publicized.  There was

1

nothing ambiguous about the conditions, nothing unusual, given the law's protection of victims of sexual assault in Massachusetts, and nothing new to Court TV, who has covered such trials in Massachusetts for decades.

But Court TV apparently believed in this case that these restrictions were merely advisory: instead of making sure their team strictly complied with the Court's orders, Court TV just shrugged and allowed Doe's name to be printed on the chyron for its cablecast not once but twice – with the second time occurring after it had been put on notice of the first violation. That content was then published to various social media platforms with Doe's identity then going viral on the internet.

Doe quickly faced vile and reprehensive commentary from an international audience. The damage was done – and permanent: Doe's identity had spread, and similar commentary appeared on sites beyond Court TV's reach. Much of that commentary remains available today.

The second trial, ending in a guilty verdict, should have presented an opportunity for Doe finally to heal from the trauma of her rape. Instead, she finds herself now separately traumatized by the irresponsible disclosure of her identity – a harm that, given the internet's enduring nature, cannot be remedied and is unlikely to abate.

Doe served Court TV's parent company with a demand letter pursuant to Massachusetts General Laws Chapter 93A. Court TV rebuffed the invitation to resolve this matter.

Doe is thus obliged to seek redress in court, asking that Court TV be held accountable for the damage it has caused and continues to cause and to ensure that Court TV understands that they may not come into courtrooms in this Commonwealth, ignore their rules, and exploit sexual assault survivors for their own profit.

THE PARTIES

1.    Plaintiff Jane Doe ("Doe") is a resident of Suffolk County, Massachusetts.  She was the complaining witness in Commonwealth v. Terence Crosbie, tried in Suffolk County, Boston, Massachusetts in October 2025.

2.    Defendant E.W. Scripps Company is an Ohio corporation with a principal place of business at 312 Walnut Street, Cincinnati, Ohio.  During retrial, until February 2026, E.W. Scripps Company owned and operated Court TV.

3.    Defendant Keli Network Inc. d/b/a Jellysmack ("Jellysmack") is a Delaware corporation with a principal place of business at 450 Park Ave South, New York, NY 10016. It acquired Court TV in February 2026.

4.    Defendant Court TV ("Court TV") is a digital broadcast television network that provides live, gavel-to-gavel coverage and legal reporting. As of February 2026, it is owned by Jellysmack.

JURISDICTION

5.    This Court has jurisdiction over this matter under 28 U.S.C. § 1332, as the parties are diverse in citizenship and the amount in controversy is over $75,000.

FACTS

6.    Terence Crosbie ("Crosbie") is from Ireland. He is a firefighter and member of the Dublin Fire Brigade.

7.    In mid-March 2024, Crosbie traveled to Boston because he was scheduled to march in the city's March 17, 2024 St. Patrick's Day Parade with other members of his Brigade.

3

8.    On March 14, Doe met one of Crosbie's colleagues, and she visited him that night in his hotel room at the Omni Parker Hotel in Boston.  She fell asleep in his room.

9.    Later, in the early morning hours of March 15, she was awakened by Crosbie in the bed, raping her.  She did not invite his presence.  He did not care.

10.    Crosbie was interviewed by police on March 16, 2024.

11.    He then booked an international flight back to Ireland for later that night – March 16 at 10:10pm.  This was earlier than his scheduled departure, which should have occurred after the March 17th parade.

12.    After arriving at the airport, Crosbie changed his flight to an even earlier departure – 7:00pm.

13.    Crosbie boarded the 7:00pm flight to Ireland.  He, however, was arrested on the tarmac of Logan Airport by the Massachusetts State Police in coordination with Customs on a warrant for the felony rape of Doe.

14.    Crosbie was detained in Massachusetts after arrest.

15.    Crosbie was indicted by a grand jury sitting in Suffolk County.

16.    The Commonwealth tried Crosbie on the indictment of rape in in June 2025.  Doe testified at this first trial.

17.    The trial was not televised, and Doe's identity was not made public.

18.    That trial ended in jury deadlock, and the judge declared a mistrial.

19.    Although disappointed with the outcome, Doe did not feel increased emotional distress when the first trial ended.  Rather, she primarily felt relief, as she knew she had done everything she could do to convict her rapist.

20.     Shortly thereafter, the Commonwealth informed Doe that it intended to try the case again and asked if she again would participate as a witness.

21.     After careful consideration of the emotional toll that would accompany testifying again, Doe agreed to testify as the necessary complaining witness in the Commonwealth's case.

22.     Crosbie's identity, the lurid details, and the mistrial drew international attention to this case.  Its second trial had the promise of a "must watch" spectacle.

23.     Court TV rushed to profit from the moment and sought permission from the Superior Court to live record and live stream the proceedings.

24.     In the Commonwealth' Superior Courts, recording is not permitted "unless prior authorization . . . is granted by the justice then having immediate supervision of [the] courtroom."  See Superior Court Rule 17.

25.     The Supreme Judicial Court ("SJC"), while mandating that the trial court permit "photographing or electronic recording or transmitting of courtroom proceedings open to the public by the news media," likewise acknowledges the need for reasonable limits to such access. See SJC Rule 1.19 ("Electronic Access to the Courts").

26.     Relevant here, the Superior Court may "impose limitations necessary to protect the right of any party to a fair trial or the safety and well-being of any party, witness or juror, or to avoid unduly distracting participants or detracting from the dignity and decorum of the proceedings."  See SJC Rule 1.19 ("Electronic Access to the Courts").

27.     Additionally, and of particular relevance, it is separately commanded that sexual assault victims "may not be photographed without the consent of the judge."  Id.

5

28.     It was in this context that Court TV's request for access to the re-trial was granted – with limitations, including the following: The coverage could not include any information which would reveal Doe's identity.  Court TV could not cablecast her image, disclose her name, or reveal other identifying information.

29.     This restriction was consistent with longstanding public policy in the Commonwealth protecting the identity of sexual assault survivors.  <u>See</u> Mass. Gen. Laws ch. 233, § 21B (rape shield law); Mass. Gen. Laws ch. 265, § 24C (requiring that any "portion of the records of a court . . . which contains the name of the victim" of sexual assault "*shall be withheld* from public inspection" (emphasis added)).

30.     The Commonwealth retried Crosbie in October 2025.

31.     Doe testified over the course of two days.

32.     Court TV's chyron displayed Doe's full name not once but twice while she was testifying, the second known infraction occurring when Court TV was already on notice of the first.

33.     As a result, and in violation of the protections afforded her, Doe's name became known to the courtroom, those watching in real time, and then – when Court TV published the offending content on YouTube, Facebook, and other social media – the world.  The comment sections of Court TV's videos were replete with often negative (indeed, sometimes reprehensible) references to Doe's identity.

34.     In light of this, before any verdict was reached, the Commonwealth filed a motion for a finding that Court TV violated the trial court's order regarding Doe's identity so that, to the extent Court TV would seek similar access in the future, a court assessing that request would be aware of the violation.

35. On the final day of jury deliberations, the court addressed the Commonwealth's motion. In so doing, it first noted that it had been "intending to make [such] a finding without a motion" and also to "inform the SJC [that] their rule . . . was violated in a pretty serious way." Exhibit A (Transcript).

36. Court TV conceded the violations. Ex. A.

37. The trial court then proceeded to find that Court TV had violated its order. Its ruling was clear: Court TV's violation of the trial court's narrow restriction on the victim's identity "violated the victim's rights."

38. The trial court was also clear as to the egregiousness of the conduct: "Court TV is the one who decided that even though we are responsible for both the visual content and the comments, even though this is our comment section and we're responsible for it, we're not going to monitor it in order to make sure that we don't violate Massachusetts law and in order to make sure that we don't violate the Court Order." Ex. A.

39. The trial court went further. It found not only that Court TV did not even try to monitor the coverage but also that the incident revealed noted that Court TV did not "have the technology" to livestream sexual assault trials while safeguarding the victim's rights, and the court indicated that it did not "know why Court TV would ask to do this again in a sexual assault trial in Massachusetts." Ex. A.

40. In so holding, the trial court lamented the cost of Court TV's conduct, noting that while it "allowed Court TV to broadcast this trial because that is what we do in Massachusetts," Court TV's abuse of that permission had caused a harm that the trial court could not "put back in the bottle" given that "in this day and age [, the identity] is out there forever." Ex. A.

41.     The trial court was, unfortunately, correct.  Although Court TV (eventually) endeavored to remove the references to Doe's identity from its videos and related comments, the damage was already done.

42.     Indeed, to this day, references to Doe's identity appear in vile and derogatory comments on coverage about the trial across platforms.

43.     Given the enduring presence of her identity on social media and on the Internet more generally, Doe is painfully aware that every time someone searches for her name this traumatic event will surface, and she must live her days knowing that at any point she may again be confronted with what occurred.  This is compounded by the fact that Crosbie has indicated his intent to appeal, so this matter will continue to be in the news in the future.

44.     This reality has caused and continues to cause Doe great emotional, physical, and economic damage.

45.     Doe has been focused on therapy since the criminal assault in March 2024.  That said, between the two trials, she was at a point in her treatment where she was planning to decrease her therapy sessions.

46.     Court TV's conduct during the second trial made that impossible.  Despite finally receiving a guilty verdict, Doe finds that, following this second trial, and in contrast to following the prior mistrial, her fear, anxiety, and depression have been greatly exacerbated.

47.     Since the release of her name, Doe's weekly and monthly therapy sessions must now address panic attacks she had not previously suffered (even during and after the first trial), additional sleeplessness, and increased anxiety, and she has been prescribed at least one additional prescription medication for the foreseeable future for her panic attacks.  She also now takes an over-the-counter sleep aid as needed.

48.     Doe must pay for these increased therapy sessions out of pocket.  She also must pay for the new sleep aid and the copays for her additional prescription medication.

49.     She experiences increased incidents of uncontrollable crying, inability to breathe, nausea, headaches, and exhaustion.

50.     Doe's work requires that she appear often in court, where she frequently encounters news outlets broadcasting trials.  The sight of these outlets increases her anxiety and makes her day-to-day work more difficult.

51.     In light of her enduring harm and Court TV's (conceded) violations, Doe sent a letter pursuant to Massachusetts General Laws Chapter 93A to Defendant E.W. Scripps on January 22, 2026.  That letter described the unfair and deceptive conduct detailed in this Complaint, requested actual damages in the amount of $2.8 million, and asked E.W. Scripps to engage in a discussion.

52.     E.W. Scripps responded, denying the wrongfulness of its conduct and otherwise refusing to engage.

53.     After Defendant Jellysmack acquired Court TV, on April 22, 2026, Doe sent her demand letter to Jellysmack and again requested a discussion.

54.     Jellysmack similarly refused.

55.     On information and belief, E.W. Scripps may have assigned some or all its rights and liabilities to Jellysmack in the January 2026 acquisition and at any rate, going forward Jellysmack would be responsible for any and all injunctive relief awarded to Doe.

56.     On information and belief, Court TV continues to seek permission to cablecast trials in the Commonwealth, including sexual assault trials, despite knowing it does not have the technology to safeguard the victims' identities.

<u>COUNT I</u>
<u>Unfair and Deceptive Business Practices – Violation of Mass. Gen. Laws ch. 93A, §§ 2, 9</u>

57.    Plaintiff repeats the above paragraphs as fully incorporated herein.

58.    Defendants are engaged in trade or commerce in their provision of media content.

59.    Defendants engaged in deceptive and unfair practices when Court TV flagrantly violated the Commonwealth's public policy and the trial court's order and disclosed Doe's name to the public.  Such behavior offends traditional concepts of unfairness, and it is immoral, unethical, oppressive, and unscrupulous.

60.    Court TV's unfair conduct occurred primarily and substantially within the Commonwealth.

61.    Doe made demand on Defendant E.W. Scripps on January 22, 2026.  That letter described the unfair and deceptive conduct detailed in this Complaint.

62.    To compensate for Court TV's tortious and statutory violations, the letter requested actual damages in the amount of $2.8 million.

63.    After Defendant Jellysmack acquired Court TV, on April 22, 2026, Doe sent her demand letter to Jellysmack.

64.    Neither Defendant engaged in any reasonable tender of settlement.

65.    Defendants' unfair conduct has caused and continues to cause Doe harm.

66.    Defendants knew or should have known that Court TV's technology could not protect Doe's identity, particularly after the first violation, and that, as such, its representation to the Commonwealth and to Doe that it could was unfair and deceptive in violation of Chapter 93A.

67.     As a result, Doe has experienced economic harm, including but not limited to increased medical bills and costs related to acquiring new medications for her emotional distress and sleeplessness.

## Count II
### Invasion of Privacy – Violation of Mass. Gen. Laws ch. 214, § 1B

68.     Plaintiff repeats the above paragraphs as fully incorporated herein.

69.     By virtue of public policy of the Commonwealth and the trial court's ruling in limine, Doe's identity was a private fact.

70.     Court TV's cablecast of her identity constituted gathering and disseminating of a fact of a private nature.

71.     Court TV disclosed that private fact on at least two separate occasions.

72.     Those disclosures caused an unreasonable, substantial, and serious interference with Doe's privacy, including but not limited to allowing members of the media and general public to contact or attempt to contact her directly about her rape allegation.

## Count III
### Intentional Infliction of Emotional Distress

73.     Plaintiff repeats the above paragraphs as fully incorporated herein.

74.     Through its conduct, described above, Court TV intended to cause Doe emotional distress or knew or should have known that emotional distress was likely to result from its conduct.

75.     Court TV's conduct was extreme and outrageous, beyond all possible bounds of decency, and utterly intolerable in a civilized community.

76.     Court TV's conduct has caused and continues to cause Doe severe emotional distress of a nature that no reasonable person could be expected to endure.

11

Court IV
Negligent Infliction of Emotional Distress

77.     Plaintiff repeats the above paragraphs as fully incorporated herein.

78.     Court TV's conduct, described above, would have caused a reasonable person to suffer emotional distress.

79.     Court TV's conduct caused and continues to cause Doe emotional distress.

80.     Doe's mental anguish and emotional distress have been severe enough that they have caused physical harm manifested by objective symptomology.  These symptoms include, but are not limited to, increased panic attacks, nausea, headaches, and exhaustion.

PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff Jane Doe respectfully prays that this Court:

a)  Enter judgment in her favor on all counts of her Complaint;

b)  Award her all damages she has proven at trial to have suffered, including, *inter alia,* compensatory and consequential damages, harm to reputation, and damages for emotional distress, physical and mental suffering, and medical bills;

c)  Award her attorneys' fees, costs and interest;

d)  Award her appropriate equitable relief;

e)  Award her punitive damages; and

f)  Award her such other relief as the Court deems just and proper.

JURY DEMAND

Doe demands a trial by jury on all claims so triable.

Respectfully submitted,

JANE DOE
By her attorneys,
/s/ Martha Coakley
Martha Coakley (BBO #087300)
mcoakley@zuckerlawgroup.com
Ellen Zucker (BBO #568051)
ezucker@zuckerlawgroup.com
Kimberly Crowley (BBO #707072)
kcrowley@zuckerlawgroup.com
Zucker Law Group LLP
33 Arch Street, 25th Floor
Boston, MA 02110
(617) 865-8967

Dated: August 3, 2026

# EXHIBIT A

COMMONWEALTH OF MASSACHUSETTS


Suffolk, ss.
Superior Court

Criminal Action No. 2484CR00244
Department of the
Trial Court


\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
                                          \*
THE COMMONWEALTH                          \*
                    Plaintiff             \*
                                          \*
v.                                        \*
                                          \*
TERENCE CROSBIE                           \*
                                          \*
                    Defendant             \*
                                          \*
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*


DAY EIGHT OF JURY TRIAL

EXCERPT RE:   COURT TV


Suffolk Superior Court
3 Pemberton Square
Boston, Massachusetts  02108


Before:  Wall, J.

Thursday October 24, 2025

Faye LeRoux

Court Reporter


R. & F. LeRoux Court Reporting Inc.

8-2

APPEARANCES


Erin Murphy, Esq.
Daniela Mendes, Esq.
Assistant District Attorney
1 Bullfinch Place
Boston, MA.   02114


For:   The Commonwealth


Daniel Reilly, Esq.
Patrick Garritty, Esq.
Brad Bailey Law
44 School Street
Suite 1000
Boston, MA 02118


On behalf of Terence Crosbie

8-3

**_EXHIBITS_**

EXHIBIT                    DESCRIPTION                        PAGE

J            Court TV USB  ...........................6

R. & F. LeRoux Court Reporting Inc.

(In session at 9:22 AM)

(Jury enters at 9:22 AM)

THE CLERK:  Before the Court your Honor, this is the continuation of the Commonwealth v. Terence Crosbie, indictment number 2024-244.  Mr. Crosbie is present.  All counsel are present, twelve deliberating jurors and three alternates.

THE COURT:  Alright.  Good morning. Welcome back to our alternates and our deliberating jurors.  Please raise your hand if you had an issue with the instructions overnight?

All right I'm excusing you to resume your deliberations.

(Jury exits at 9:23 AM).

THE COURT:  The first mater, did the lawyers get a copy of the decision that I wrote on Dr. Rosenbaum?

MS. KUSMIN:  Yes, your Honor.

THE COURT:  Did you get that counsel?  I think it was yesterday morning.

THE CLERK:  It was yesterday.  And we did mark the trial transcript of his

8-5

testimony as G for identification.

MS. MURPHY:  I'm asking you to essentially make a finding on the record that there is a violation of this court's order. And I would note separately it's also followed section of the Statute cited in my motion.

But I'm asking the Court specifically to make a finding that the order itself was violated and that is so there's a record of this for any future case where Court TV seeks the Court's permission to film or otherwise record and broadcast the proceedings.

I think it's important for judges who are assessing those requests in the future to be aware of this.  And I understand Court TV's position that it was inadvertent but the effect is the same.

And it's the effect that I think is -- is what the Court to should be aware of. And also I was made aware through Court TV's communication with my office that there was an

R. & F. LeRoux Court Reporting Inc.

additional broadcast from Mr. Riley's closing that they themselves caught it, but after the victim's name was broadcast.

THE COURT:  Is your office in touch with Court TV?

MS. MURPHY:  As of yesterday believe they were.  I saw an e-mail.  That's how I learned of the most recent broadcast of the victims name's.

THE COURT:  Alright, so we have the Commonwealth's motion and it was served on defense, correct?

MS. MURPHY:  Yes.

THE COURT:  Yes, so they have seen it.  And then you have submitted the USB.  So we are going to mark that for identification. If we could do that please.

(Exhibit J; Court TV USB was marked for identification.)

THE COURT:  And I'm going to impound that.

MS. MURPHY:  Thank you.

THE COURT:  I was intending to make

R. & F. LeRoux Court Reporting Inc.

a finding without a motion.  I was going to make a docket finding because I think it's important that I'm also going to inform the SJC, who -- it's their rule, so that they are aware of it because it's a statute that pertains throughout the state and it was violated in a pretty serious way.

There is international availability of this feed --

MS. MURPHY:  And I would note that even in other media platforms, even on newspaper online articles in the comments, separate from Court TV, it is making reference to Court TV having broadcast the victim's name. So it is just continuing to spread.

THE COURT:  Do you know if Court TV has mentioned at all in their coverage that they violated Massachusetts statute and the Court order?

MS. MURPHY:  I don't believe that they have.

THE COURT:  Do you think Court TV is broadcasting this right now?

MS. MURPHY:  I'm not sure.

THE COURT:  Alright.  So obviously the camera is running, but I don't know what is actually being broadcast.  Does the defense have a possession on this?  What would you like to be heard on?

MR. REILLY:  That defense no position, your Honor.  We defer to the Court.

THE COURT:  Alright.  So I'm going to give -- Ms. Smith is here, I will give Court TV an opportunity to put anything on the record.  And my intention is to look at Exhibit J, but I also have information that has been given to me through the course of the trial, so I am already aware what happened over the weekend and the way things were posted on the comments that were up.

All right.  So we have something from Court TV?  Thank you Ms. Smith.  Let me take a look.  Alright so I'll look at what Court TV has filed and right now the status of this is, we're just trying to document the facts and we haven't moved beyond that.  Nobody has asked for any additional sanction.

I denied the request Monday morning

R. & F. LeRoux Court Reporting Inc.

that Court TV be ordered to remove their cameras. I believe my ruling was that if we had another violation I would consider removing. But right now it does not appear that we're running much risk or any risk that there would be a repeat violation as we wait for jury deliberation. Would you agree with that?

MS. MURPHY: Well, the repeat violation apparently happened as a result of the broadcast of Mr. Riley's closing. That was the repeat violation. Now we're at the point where it's unlikely that there will be more, but that was after the Commonwealth's motion to have the cameras removed.

THE COURT: Alright, so Ms. Smith, what would you like to say?

MS. SMITH: I provided you a statement on our behalf. Ms. Murphy notified me yesterday that there may have been an incident. This is prior to the jury deliberating yesterday. She returned and I asked her specifically if she knew exactly where it happened.

R. & F. LeRoux Court Reporting Inc.

I told her while I had time sitting in the courtroom I was going to pore through over 30 hours of content to try to find where there was a instance that the victim's name was said.  I was not given any guidance, I was not told what day it happened, I just started randomly looking at videos.

It wasn't until the end of the day after Court was over that I was notified that it was on our Facebook page.  And once I got that detailed information --

THE COURT:  So it was video on the Facebook page?

MS. SMITH:  It was video on the Facebook page but the content that was on our website and also on our YouTube page, it did have the audio drops, I think the software when we transferred it over to Facebook, it eliminated that one moment where we did a manual mute of the audio.

THE COURT:  So what was on the Facebook page, it was Court TV's Facebook page --

MS. SMITH:  It was Court TV's

R. & F. LeRoux Court Reporting Inc.

Facebook page --

THE COURT:  -- and it was video of Mr. Riley delivery his closing argument --

MS. SMITH:  Yes, your Honor.

THE COURT:  -- and he of course was permitted to say the victims name --

MS. SMITH:  Yes, your Honor.

THE COURT:  -- so that clip was not edited as it appeared on the Facebook page?

MS. SMITH:  It was edited --

THE COURT:  But as it appeared on the Facebook page.

MS. SMITH:  As it appeared on the Facebook page there was one instance where the audio was not completely muted but it was muted when the video was broadcast.  It's on our YouTube page and I also have video as well, proving that fact as well.  And also on our webpage.

It's no excuse.  I don't have a Facebook page, I don't engage in social media, so I would not have known to go to social media to look there.  But we have other teammates that I did inform first thing in the morning,

R. & F. LeRoux Court Reporting Inc.

as soon as she brought it to my attention, I informed our entire management team that there was a problem but I did not know where the problem --

THE COURT:  So this is not a sanctions hearing.

MS. SMITH:  Okay.

THE COURT:  This is not a sanctions hearing, I'm trying to establish the facts. You agree that last week that the Court TV aired the victim's name.

MS. SMITH:  Inadvertently, yes.

THE COURT:  Yes.  And how many times do think that happened last week?

MS. SMITH:  So when we checked there have now been two incidents where ▆▆ ▆▆▆▆▆ was heard in the audio out of over 30 hours of content.

THE COURT:  So there were two incidents that you are aware of last week?

MS. SMITH:  No, not last week. There was one last week and then the one that I was informed of today -- I'm sorry, yesterday.

THE COURT:  So your understanding is

R. & F. LeRoux Court Reporting Inc.

that last week in the hours that Court TV aired there was one time that the name was not edited?

MS. SMITH:  Yes, there was one time.

THE COURT:  And so that the comments where viewers had apparently heard the name and were using the name --

MS. SMITH:  Right.

THE COURT:  -- that was based on one mistake?

MS. SMITH:  Right.  And once we addressed that issue all of the comments have been turned off -- off of all of our social media pages.  Off of our website and also YouTube feeds.  We have not had any comments on any of our sections.

THE COURT:  Do you also agree, and I think this is already on the record from Monday, that Court TV agrees that in the comments section the victim's name was used more than once.  I don't know whether several times or many times, and those comments were up for days over the weekend.

MS. SMITH:  Again --

R. & F. LeRoux Court Reporting Inc.

THE COURT:  Do you agree with that?

MS. SMITH:  I do agree with that. But I also agree that the PIO, if you look at the back of that packet I sent you, from the Commonwealth's office -- informed us about this trial.  They had phone numbers and e-mail address where they could have contacted any one from my team on Friday to inform us of the issue where we could have addressed it prior to Monday.

I felt completely blindsided when I was told about this on Monday.  I had not been notified --

THE COURT:  So this is not about you.

MS. SMITH:  Right, I understand that.

THE COURT:  This is not about you, so when you're talking about being blindsided, you need to talk to court TV about blindsiding you because they're the ones who didn't tell you:  By the way, anything you post on social media or anything that's posted on the comments, we're not going to review that, and

R. & F. LeRoux Court Reporting Inc.

we're not going to apply the Court order to that and we're not going to apply Mass. Statute to that.  We're going to ignore the Statute, we're going to ignore the law and we're going to ignore the Court's order.

So it's Court TV that blindsided you, not anybody here in the court system. Because Court TV is the one who decided that even though we are responsible for both the visual content and the comments, even though this is our comment Section and we're responsible for it, we're not going to monitor it in order to make sure that we don't violate Massachusetts law and in order to make sure that we don't violate the Court order.

I would also add that you were blindsided because they didn't monitor it in order to make sure that they get to cover another sexual assault trial in Massachusetts. That is really what's at issue right now.  That is really what's at issue.  Unfortunately what's not at issue, I allowed Court TV to broadcast this trial because that's what we do in Massachusetts.

R. & F. LeRoux Court Reporting Inc.

It's a public courtroom and unlike some other jurisdictions, including the federal jurisdiction, Massachusetts decided long time ago that airing a trial beyond the four walls of the courtroom, that there's a public interest in doing that.

So we have a Supreme Judicial Court ruling that permits that, encourages that and really informs the judge that there needs to be some specific reason that you don't permit that. So I did my best to follow the rule and to rely on Court TV to follow the rule and the law.

So what is not at issue, we have already violated the victim's rights. We've already done that and I can't put that back in the bottle. So what this is about now is what's going to happen the next time Court TV wants to broadcast a sexual assault trial in Massachusetts you might consider whether you would even try to do that knowing what happened here.

What is not at issue here because we already failed, we've already failed that

R. & F. LeRoux Court Reporting Inc.

victim.  And so I'm a lot more concerned about that than I am about whether somebody at Court TV was blindsided.  That's not really the issue.

MS. SMITH:  Understood.

THE COURT:  You know, it's sad, it's sad that somebody is a sexual assault victim and there is a law to protect that person and her name is out there.  And in this day and age it's out there forever.  And we all participated in that except the District Attorney's Office that asked that the trial not be -- and of course the defense doesn't have anything to do with it, but the rest of us, we are all part of that.

All right, so based on what's established including from this hearing I will be making a finding and it needs to be on the record because hopefully Court TV realizes that they don't have the technology to do this and so that they really shouldn't.  I hope somebody there recognizes the harm that has been done and realizes that this should not be happening, a sexual assault trial should not be broadcast

in this way with the technology that we have.

And I don't know why Court TV would ask to do this again in a sexual assault trial in Massachusetts.

Thank you.

(Recess at 9:38 AM).

C E R T I F I C A T E

I, Faye LeRoux, do hereby certify that the foregoing proceedings were taken down by me as stated in the caption; that the foregoing proceedings were reduced to print by me, that the foregoing pages represent a true and correct transcript of the proceedings, that any and all Exhibits remain unaltered and that any and all copies and/or facsimile are true and correct to the best of my knowledge and ability.  I further certify I am neither kin nor counsel to any of the parties and am not financially interested in the outcome of the action.  The certification is expressly withdrawn and denied upon the disassembly or photocopying of the foregoing transcript of the proceedings or any part thereof, including exhibits, unless said disassembly or photocopying is done by the undersigned court reporter and the signature and original seal is attached thereto.


        DATED December 30, 2025

 Faye LeRoux

 ...............................................

 Faye LeRoux, Court Reporter




            R. & F. LeRoux Court Reporting Inc.